# 13-2828-pr

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JULIO ALVAREZ,

Petitioner-Appellee,

v.

ROBERT ERCOLE, Superintendent,
Green Haven Correctional Facility,

Respondent-Appellant.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR PETITIONER-APPELLEE JULIO ALVAREZ**

WILLIAM CARNEY
Attorney for Petitioner-Appellee
The Legal Aid Society
Criminal Appeals Bureau
199 Water Street, 5th Floor
New York, N.Y. 10038
(212) 577-3447
wcarney@legal-aid.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................... i

STATEMENT OF THE CASE ........................................ 1

STATEMENT OF FACTS .......................................... 2

    Introduction ............................................ 2

    The Defense Opening Statement ........................... 4

    The Trial Testimony ..................................... 4

    The Court Applies the Rule of Third Party Culpability .... 14

    Counsel Asks the Court to Reconsider its Rulings ........ 16

    Continued Trial Testimony .............................. 17

    The Defense Case ....................................... 18

    Further Objections ..................................... 18

    Counsel Asks the Court to Reconsider its Rulings ........ 16

    Summations ............................................. 21

    Verdict and Sentence ................................... 23

    The Appeal to the Appellate Division, First Department ... 24

    The Habeas Corpus Petition ............................. 26

    The District Court Opinion ............................. 27

ARGUMENT

<u>POINT I</u>

THE DISTRICT COURT CORRECTLY CONCLUDED THAT
THE STATE COURT DEPRIVED PETITIONER OF HIS
RIGHTS OF CONFRONTATION AND TO PRESENT A
DEFENSE WHEN IT PRECLUDED ALL QUESTIONING
REGARDING THE POLICE FAILURE TO INVESTIGATE
INFORMATION THAT JULIO "CHAN" GUERRERO, WHO
DROVE A GRAY CAR, SHOT DANIEL COLON WITH A 9
MILLIMETER PISTOL FOR REASONS UNRELATED TO
PETITIONER'S OSTENSBILE MOTIVE. U.S. CONST.,
AMENDS. VI, XIV. .................................... 33

CONCLUSION .................................................. 63

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ..................... 64

## TABLE OF AUTHORITIES

**CASES**

Alvarez v. Ercole,
  No. 09-CV-2696.................................................1

Brecht v. Abrahamson,
  507 U.S. 619 (1993)..........................................57

Brinson v. Walker,
  547 F.3d 387 (2d Cir. 2008).............................37, 59

Chambers v. Mississippi,
  410 U.S. 284 (1965)..........................................39

Corby v. Artus,
  699 F.3d 159 (2d Cir. 2012)..................................59

Cotto v. Herbert,
  331 F.3d 217 (2d Cir. 2003).............................36, 38

Davis v. Alaska,
  415 U.S. 308 (1974).....................................Passim

Delaware v. Fensterer,
  474 U.S. 15 (1985)...........................................39

Delaware v. Van Arsdall,
  475 U.S. 673 (1986).....................................Passim

Francis v. Stone,
  221 F.3d 100 (2d Cir. 2000)..................................36

Fry v. Pilier,
  551 U.S. 112 (2007)..........................................57

Hawkins v. Costello,
  460 F.3d 238.................................................42

Kyles v. Whitley,
  514 U.S. 419 (1995)..........................29-30, 40, 56

Lockyear v. Andrade,
  538 U.S. 63 (2003)...........................................36

Nelson v. Walker,
  121 F.3d 828 (2d Cir. 1997)..................................35

_Olden v. Kentucky_,
    488 U.S. 227 (1988) ........................................ 39-40

_Pennsylvania v. Ritchie_,
    480 U.S. 39 (1987) .......................................... 37

_People v. Alvarez_,
    44 A.D.3d. 562 (1st Dept. 2007) ............................ 26

_People v. Alvarez_,
    9 N.Y.3d 230 (2008) ........................................ 26

_People v. Primo_,
    96 N.Y.2d 351 (2001) ................................... 15-16, 48

_Schiro v. Landigran_,
    127 S.Ct. 1933 (2007) ...................................... 36

_Torres v. Berbary_,
    340 F.3d 63 (2d Cir. 2003) ................................. 35

_United States v. Maldonado-Rivera_,
    922 F.2d 934 (2d Cir. 1990) ................................ 38

_United States v. Reifler_,
    446 F.3d 65 (2d Cir. 2006) ................................. 60

_United States v. Scheffer_,
    523 U.S. 303 (1998) ........................................ 31

_Watson v. Greene_,
    640 F.3d 501 (2d Cir. 2011) ......................... 54-56, 59

_Williams v. Taylor_,
    529 U.S. 362 (2000) ..................................... 35-36

**STATUTES**

28 U.S.C. §2254 ............................................... 1

28 U.S.C. §2254(d) ........................................... 35

28 U.S.C. § 2254(e)(1) ................................... 35, 43

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
----------------------------------X

JULIO ALVAREZ,                          :

       Petitioner-Appellee,      :

         -against-            :

ROBERT ERCOLE, Superintendent,          :
Green Haven Correctional Facility,

       Respondent-Appellant.     :

----------------------------------X


## APPELLEE'S BRIEF

## STATEMENT OF THE CASE

The People ("appellant") appeal from an order and judgment of the United States District Court for the Southern District of New York, Colleen McMahon, J., granting a petition for a writ of habeas corpus on the merits on July 12, 2013 (Alvarez v. Ercole, No. 09-CV-2696, pursuant to 28 U.S.C. §2254. In his petition and supporting memorandum of law, petitioner urged, inter alia, that the New York State court incorrectly and unreasonably applied the rule of Davis v. Alaska, 415 U.S. 308 (1974) in precluding all questioning about the police failure to follow up on information placed in the lead detective's case file indicating that a man named Julio Guerrero, who drove a gray car, shot Daniel Colon because of an insult to Guerrero and his wife.

**STATEMENT OF FACTS**

INTRODUCTION

Petitioner was charged with the shooting death of Daniel "Dap" Colon, a neighborhood drug boss in the Hunts Point area of the Bronx, and injury of Manny Colon and Aramis Fournier, two of Dap Colon's drug-dealing employees. Petitioner's conviction on these charges rested largely on the testimony of Colon and Fournier. Fournier, however, had failed to identify petitioner's photo in an array shortly after the shooting. He later claimed that he recognized petitioner as the shooter after being visited by Colon's family. The jury never learned that an informant named Edwin Vasquez approached detectives assigned to this case within two days of the incident and with information about the Colon shooting. Vasquez told the detectives that the shooter drove a gray Acura, not the gold Toyota Camry that petitioner drove. Vasquez also told the detectives that a man he knew as Julio "Chan" or "Chung" (later identified as Julio Guerrero) had talked to him about the Dap Colon shooting on Bryant Avenue and admitted that he "took care of the problem" he had with Colon. Colon had argued with Guerrero's wife, Bianchi, and then slapped Guerrero when he confronted Colon about it. "I can't let such a thing lie," Julio Guerrero had said to Vasquez. The interview notes also indicated that Guerrero said he had used a borrowed 9 millimeter pistol. Dap Colon had been killed with a 9

2

millimeter. The interview report further indicated that Guerrero associated with a man known as General who drove a black Jeep Cherokee.

Another DD-5 contained information about the interview of a witness named Ariel Roche, who worked at an auto shop near the shooting. Roche told the investigators that the shooter's car was a gray or possibly tan colored "Maxima or Altima type vehicle," with New York plates. Petitioner's gold Camry had Connecticut license plates.

These DD-5's were turned over to the defense with all of the contact information redacted, and although defense counsel repeatedly requested unredacted copies of these reports on <u>Brady</u> grounds, the prosecutor refused to provide them until the trial started. At that point, the defense attempts to locate these witnesses were unsuccessful. The trial court refused to allow defense counsel to ask any questions about the detectives' failure to pursue any of the leads in these interviews in their case file. Despite the late disclosure, however, defense counsel was able to identify Julio "Chan" as Julio Guerrero -- a Hispanic man with a record of drug and gun offenses who lived just doors down from the crime scene. His wife's name, consistent with Vasquez's information, was Bianchi. Guerrero, however, had warranted on a minor traffic offense (involving his gray Acura) two months after the Colon shooting. Although

3

Vasquez gave the detectives Guerrero's phone number, the police never bothered even to telephone him. They also never obtained a photo of Guerrero to show to the witnesses in this case.

The Defense Opening Statement

In opening, counsel argued that the case was the result of "poor, deceptive police work" and "jumping to conclusions." The quality of the police investigation was "going to be a major issue in this case," because the police "did a less than adequate job." "You are going to hear evidence that [the police] failed to follow leads, they failed to interview witnesses that didn't match their theory that Mr. Alvarez committed this crime" and "they failed to follow leads that someone else may have committed the crime" (33-38).[1] The jury would determine whether the police had "important information that they didn't follow up on" and "completely tossed aside, evidence indicating that someone else may have committed this crime" (38-39).

The Trial Testimony

The two prosecution eyewitnesses, Aramis Fournier and Manny Colon, sold crack cocaine on Bryant Avenue for the deceased Daniel "Dap" Colon. Bryant Avenue was Dap Colon's "territory;" he was "the boss" and "ran the block" (Fournier: 107-108, 164; Colon: 234, 269, 281). On April 6, 2002, Fournier received a

---

[1]   Un-prefixed parenthetical references are to the pages of the trial minutes.

4

telephone call from another member of their drug-selling operation informing him that the police had raided "the spot" at 735 Bryant Avenue where they stored their drugs (Fournier: 162). Fournier went to the apartment and told the police officers present that he was the nephew of the tenant and needed the keys to lock up, although he actually wanted to get their drug business operational again (110, 165-167). Later that morning, Fournier received a call from Dap Colon wondering why no one was selling drugs out on the street (Fournier: 111). Fournier then called Manny Colon (Colon: 241, 272).

The three met at a nearby sandwich shop and as they walked toward the apartment "a gold Toyota Camry" pulled slowly alongside them. The driver had his window down and said, "what's up now, Dap?" (Fournier: 111-112, 173; Colon: 244). The man "just started shooting" and they all ran (Colon: 244). According to Fournier, the car double-parked, and as the driver exited, Dap and Manny Colon immediately started to run (112, 172). Manny Colon ran into 735 Bryant and guessed two guns were being fired, but never saw a second person (Colon: 246-247). Fournier was frozen in shock, but also "making eye contact all the time," he claimed, so the shooter did not "point the gun at me and shoot me" by "mistaking me for someone else." Someone pushed Fournier from behind, telling him to get down. He threw himself down and pretended to be dead (Fournier: 112, 117, 178).

Fournier saw Dap Colon fall to the ground and claimed that he saw two gunmen five or six feet away from him "over [Dap], still shooting at him." Detective Kurt Harris of the Crime Scene Unit, however, testified that no shell casings were recovered from the 13-foot-wide sidewalk where Colon was found (499), and of the eight 9 millimeter discharged shell casings, most were from the middle of the street and some from the sidewalk across the street (470-475, 497). Afterwards, both Fournier and Colon realized that they had been shot (Fournier: 113-114, 120; Colon: 247-249).

Fournier never saw the face of the second shooter, who "came from behind" but ultimately claimed that petitioner was the first shooter and that he "made eye contact" for "about 30 seconds" before falling to the ground. Immediately after the shooting, however, when asked who the shooters were, and how many there were, Fournier replied, "I don't know" ((Fournier: 114-115, 124). Similarly, when Fournier first spoke with investigating officers that day he did not name or describe petitioner. He later claimed, "I wasn't sure, to give him a description, because I didn't know if I wanted him to get caught or not." Fournier claimed that he wanted to get the shooter on his own, but since "I don't know who it is" he was "confused" (Fournier:190).

6

Manny Colon also did not tell the police investigators that he recognized the shooter, although he later claimed that he did recognize petitioner. Colon was questioned by the police at 6:30 p.m. and at 8:00 p.m. on the night of the shooting but said he did not know who the shooter was. He never claimed during that interview that petitioner was the shooter and never said that he knew the shooter's identity. He told the police "I don't know" the shooter (283-292). Later, he claimed that he had lied to the police and "just didn't want to" tell them at that time that he had seen petitioner around the neighborhood and "from what I heard," petitioner and Dap "had problems" (Colon: 236, 257). The day after the shooting, Colon first told the police that the shooter was named, "Julio" (Colon: 300-301).

While Colon initially told the police that the shooter's car was "a small gold or silver car," at trial, he testified with greater specificity and said it was a gold Camry (Colon: 244-245, 292). Fournier likewise maintained at trial that the shooter's car was a gold Toyota Camry but had told the police on the day of the shooting that the car was "possibly a Toyota." (Fournier: 145, 191-192). Fournier also maintained that he did not forget a face but acknowledged that when a detective initially showed him a photo array that included petitioner's photo he did not identify petitioner as the shooter. At trial, Fournier, like Colon, maintained that he had recognized

7

petitioner's photo at that time but "wasn't sure on telling the detective that that was him" (221). On April 15, 2002, Detective Alfred called and informed him that "we got the guy," and "have him in custody." Fournier and Colon then selected petitioner from a line-up (Fournier: 127, 208; Colon: 251-253).

Detective <u>Gary Alfred</u> spoke with Fournier and Manny Colon at Lincoln Hospital where Fournier described the shooter as a Hispanic man, medium complexion, about 5' 10" tall, 200 pounds, with short black hair (311-312). Neither man described the shooter as having tattoos on his neck and both arms.[2] Sometime later, Alfred obtained the name "Julio," and placed that name in the computer along with the description (314). Alfred explained that he got the name "Julio" from a confidential informant:

> <u>In connection with the investigation there was a phone call placed to my office from the 41st Precinct [and] a detective stated that he had an individual who had information regarding this case.</u> A couple of detectives from my office went over to interview this individual and <u>he informed them that he had information regarding the shooting and the homicide up on Bryant Avenue.</u> He informed them that he knew this one individual named Julio that went under different street names as Chang or Chung. So the detective, Detective Monaco, who is

---

[2] Petitioner was 5"8" tall and weighed 185 pounds with tattoos on both arms and his neck. He was 25 year old at that time. He had a youthful offender adjudication in 1994, for criminal sale of a controlled substance in the third degree and, in 2001, received a conditional discharge for a reckless endangerment conviction. He resided in New London, Connecticut (Probation Department's Pre-Sentence Report).

8

> presently retired, he went back to the
> office and prepared a photo array of those
> individuals in which the computer spit the
> names out under Chang or Chung (345)
> (emphasis added).

At trial, defense counsel asked the name of this informant, but an objection was sustained as the detective began to respond, "Edwin --" for the informant Edwin Vasquez. The court stated, "An objection as to the identity of the person who provided this information is sustained. It's not an issue, don't even think about it," the court ruled (346). Detective Monaco generated a photo array with the name "Chang" or "Chung" to show Colon and Fournier but they made no identification in the array. The array, however, did not include a photo of Julio Guerrero (348).

Outside of the jury's presence, Detective Alfred clarified that the name Julio "Chan" or "Chung" was not referring to Julio Alvarez (350-351). Manny Colon had said that someone named "Julio" was the shooter, and Alfred believed (without stating the basis for his belief) that "Julio" was referring to petitioner and not Julio "Chan" (351). The court ruled that defense counsel could not ask Detective Alfred any questions "designed to show that, had [the detective] pursued the investigation that you believe he should have pursued, based upon that information [from Edwin Vasquez], it might have turned up the fact that another person [also named Julio], not

[petitioner] was the killer" (353). The court ruled that there was no "legitimate basis in the law for you to continue on with the actions that [the detective] took based upon Vasquez's information" "because the ultimate conclusion that you want the jury to reach is that had he pursued this investigation further, it would have resulted in an arrest of someone else, and that, in my judgment, is bringing out hearsay information for its truth, for which there is no, in my judgment, exception" (354).

Defense counsel protested that he should be allowed to cross-examine Detective Alfred about "the nature of his investigation of information provided to another police officer by a man named Edwin Vasquez with respect to whether or not there was an alternative, or a credible third party who could have committed this crime" (368). Due to the late disclosure of the un-redacted DD-5, the defense was not able to find Edwin Vasquez and could not call him as a witness. Vasquez had vanished: "We tried to follow-up, the phone number disconnected, address no good any more, he didn't work at this location any more, gone" (374).

Vasquez had told the police that he had information about the Daniel Colon shooting. In his interview with Detective Monaco, Vasquez stated that the day after the Colon shooting a Dominican man he knew as Julio, who also used the name "Chan" or "Chung," confessed to shooting Danny Colon. Vasquez described

10

Julio as having black hair, a medium build and complexion, about
5"5" or 5" 6" tall, and in his thirties. He gave the detective a
telephone number for this Julio and said that he drove a gray or
charcoal-colored Acura (375). Julio "Chung" told Vasquez that he
had "taken care" of the now deceased Colon after he argued with
Chung's wife and punched Chung in the face. "You know that
problem I told you about, I took care of it today," Chung told
Vasquez. When Vasquez asked what Chung meant, Julio explained
that the man who was killed had an argument with his wife,
Bianchi, and Colon had punched Julio in the face and Julio could
not "let that lie." Vasquez told the detective that Julio
associated with someone known as General, whom he described as
having an apartment in Yonkers, dark skin, bald, with a "belly"
and drove a black Jeep Cherokee (375-376).

Despite this tip pointing to a different person shooting
Colon and for a reason unrelated to petitioner's supposed
motivation, the sum of the police investigation was a "Nitro"
computer search with the names "Chan" or "Chung" that yielded
two possible suspects, neither of them Julio Guerrero. Vasquez
told the police, however, that neither of these individuals was
the man who had confessed to the Colon shooting. Counsel noted
that he had easily located Guerrero through the unredacted
telephone number provided by Edwin Vasquez and discovered that
Guerrero lived at an address near the shooting with a woman

11

named Bianchi and that Guerrero had a criminal record for selling drugs (376-377). "Julio Guerrero, we looked for him, we tried to go to the source. He warranted on this case, he's nowhere to be found, he's out on a warrant status." Guerrero warranted two months after the Colon shooting on a very minor case, counsel noted, and he never returned on that warrant and now could not be found (382).

The jury should know about "the lack of police preparation, the lack of police work in what was done, based on this information, the sloppiness," counsel argued. Inexcusably, they never even spoke to Julio Guerrero and they did not show him to Edwin Vasquez, Manny Colon or Aramis Fournier (379-380).

Questioning about the failure of the police to pursue this other suspect is not hearsay, because it was "not coming in for the truth that the other Julio made the confession to Eddie Vasquez that he killed Dan Colon," but "to show the police had the information and they didn't act on it and they did nothing." The police "did nothing to find the person [Vasquez] was talking about." The jury should know that "there was another very viable suspect in this case, and they did nothing to follow-up and try to find this individual" (381-382). Counsel requested that he be able to elicit "the entirety of the information given to the police and the complete and utter lack of, inexcusable lack of preparation and investigation" (380).

Counsel objected that the late disclosure of <u>Brady</u> and restrictions on cross-examination concerning the lack of police investigation, had denied petitioner his "constitutional right to a fair trial" and to "present defenses in his behalf" (391). Counsel urged that the defense "should be able to fully explore with the Police the information that she had and their investigation or lack thereof of what they've done with that information." In relevant part, counsel argued that "the information is not being offered for the truth, it's being offered to show the bias and prejudice of the police" (391-392).

The prosecutor responded that the defense argument "starts with the fact that there were <u>Brady</u> violations by the District Attorney's office, and that the only way to cure those violations at this point is to permit them to ask questions of the witness about the nature of this investigation, to ultimately try and prove that there was a credible third person who could have committed this crime" (392). The prosecutor claimed there was no <u>Brady</u> violation since the "names and addresses of witnesses are not discoverable" (394-395). The prosecution also argued that the Vasquez statement was ambiguous, since Julio Guerrero never explicitly stated that he "is speaking of the homicide that we are on trial with" – despite his having come forward to the detective investigating this case, the detectives placing his interview notes in this

case file and despite Vasquez's identifying it as information about the recent shooting on Bryant Avenue (397).[3] Also, there was "no admission from this supposed Julio that he killed Danny Colon," and "Danny Colon's name is never mentioned here." "Julio's actions are never mentioned here," and "we don't know exactly what he's referring to." The statement was "speculation upon speculation upon speculation," according to the prosecutor (397).

The prosecutor asserted that the defense was trying to bring out the truth of the statements "that Detective Monaco interviewed a guy who said that someone other than the defendant said that he took care of a problem and therefore that person is the killer and not the defendant" (399).

The Court Applies the Rule of Third-Party Culpability to the Brady and Confrontation Issues

The court characterized the Brady and confrontation issues as "the issue of third-party culpability" and ruled that the evidence was admissible only if the defense could show "a direct connection between the alternative perpetrator and the crime so as to raise more than a mere suspicion that the alternative

---

[3] According to Detective Alfred, "A couple of detectives from my office went over to interview [Edwin Vasquez] and he informed them that he had information regarding the shooting and the homicide up on Bryant Avenue" (345)(emphasis added). Guerrero had said that the person killed had insulted his wife, had punched him, that he had vowed not to let it lie, and, with reference to the dead person on Bryant Avenue, "took care of" the problem he had. He also stated that he used a 9 mm. pistol.

14

perpetrator, not the defendant, was the perpetrator." "There must be a clear link that established that it was another that committed the crime," the court stated (404). The People's failure to timely comply with their Brady obligations "does not alter the rule" requiring a "clear link" "to a third party perpetrator," the court declared, "and it's not my position to at this point to punish the People for Brady violations by violating what I think is an established rule" (405-406).

The court ruled that since the description of Julio Guerrero in the DD-5 did not match petitioner's description and Guerrero's gray Acura did not match "any automobile that I know of that's involved in this case" the DD-5 was not a "clear link" to another perpetrator. Also, there was "no evidence whatsoever" that there was an argument between Guerrero and Danny Colon, "rather than Julio's wife," Bianchi, the court said. "[T]here is no other evidence that's been developed so far which would support this theory, certainly not the photo arrays," the court declared, even while those arrays did not contain Guerrero's photo.

According to the court, the evidence regarding "third-party culpability" was "speculation" and "did not meet the clear link standard" (406, 408).[4] The court therefore also precluded any

---

[4]    The court cited the cases of People v. Primo, 96 N.Y.2d 351 (2001) in support of its ruling (406). Defense counsel responded

cross-examination "about the nature of this investigation in large measure because that evidence does not or that investigation does not establish, in my judgment, the clear link that these cases call for when introducing evidence of third-party culpability" (410).

## Counsel Asks the Court to Reconsider Its Rulings

Counsel revisited the issue at a later point in the trial, asking the court to alter its rulings. Counsel noted that Detective Monaco had interviewed Eddie Vasquez on April 8, 2002, two days after the Daniel Colon shooting (617). The Vasquez information was "reasonably related" to this homicide: Monaco was a detective assigned to this case, and participated in the Vasquez interview to gather evidence for this case. The questioning of Vasquez began at 7:30 p.m. and photo arrays were generated from a Nitro search using Chan or Chung at 9:09 p.m. and 9:21 p.m. and were shown to Vasquez and the two eyewitnesses in this case, Fournier and Manny Colon. "So to say that they weren't sure if it was the same homicide is kind of ridiculous," counsel noted. After the police concluded their questioning at

---

that, in People v. Primo, the Court of Appeals had rejected the old "clear link" test. The court, however, replied, "That's not completely correct." "It is called a balancing of the evidence test, and that's what it really means" (411). Thus, the trial court appeared to rely upon the wrong state law standard in assessing the admissibility of the information in the Vasquez DD-5.

10:00 p.m. that night they canvassed the areas that Vasquez described as part of their investigation of this case (617-618). Moreover, Detective Monaoco's handwritten notes attached to the DD-5 of the Vasquez interview also indicated that Vasquez was aware that a 9 millimeter gun was used, and the ballistics evidence corroborated that a 9 millimeter was used in the Daniel Colon shooting (618).

Defense counsel requested that Detective Monaco be brought in and questioned about all of the information that tied the Julio Guerrero confession and Vasquez statement to this case (620). Notably, Ariel Roche had also mentioned a gold or gray car with New York plates and Guerrero's car was a gray Acura with New York plates, counsel noted (620). The court replied that it had "made a ruling and will persist in that ruling at this point" (622).

Continued Trial Testimony

Petitioner voluntarily surrendered to the police on April 15, 2002, after his attorney had called on Friday April 12th to schedule the surrender (Alfred: 314, 357-360). Detective Daniel Chin recovered a box of 45 CC-1 Blazer brand 9 millimeter ammunition from the trunk of petitioner's car (526-527). On May 21, 2002, Detective Kevin Barry of the Firearms Analysis Unit examined the rounds recovered from petitioner's car but could not find any link to the gun used in the shooting (593-594).

17

The 45 rounds were from various manufacturers and while two of the spent casings from the shooting scene had the same manufacturer as one of the types of rounds taken from petitioner's car, the other six were from different manufacturers (595-596). He believed there were at least two and possibly three guns involved in the shooting (606, 638, 641).

## The Defense Case

Margie Rodriguez, a married mother who had never been arrested, directed an after-school program in the Bronx (729-730). Her apartment on Bryant Avenue was across the street from the scene of Colon's shooting and from her window she saw the shooter's car (732). On April 6, 2002, she telephoned 911 after hearing gun shots, and the 911 tape of her call was played for the jury (738-740). She described the gunmen's vehicle to the 911 operator as being silver or gray and having a sun roof (741). Rodriguez looked at the photo of petitioner's gold Toyota and stated that it was not the vehicle she saw on April 6th (741). The shooter's car was smaller and "a silver gray" color with an oval sun roof (741-742, 744). She saw the two shooters get into the smaller, gray car and reverse it down the street to the corner (748-751, 754).

## Further Objections

Counsel stated that Ariel Roche's statement contradicted the People's claim that petitioner's car was used in the

18

shooting since Roche told the detectives that the shooters' car had "New York plates" and was a "gold or gray Altima or Maxima type vehicle." Roche worked in an auto body shop and was "certainly familiar with cars," and Roche had "a clear view of the rear of this particular vehicle." Roche "would have made a valuable witness had we been able to locate him," counsel noted (766). After the trial began, the defense was given, for the first time, an unredacted DD-5 and counsel sent an investigator to Roche's workplace. The investigator learned that Roche had moved to Puerto Rico in October, 2002, six months after the shooting (766-767). Counsel noted that we "couldn't bring it out through any of the witnesses in the People's case," because the court precluded the defense from doing so, but "we would like to be able to raise that issue procedurally." "I know that it was a Detective Donnelly that interviewed him, or fashion some sort of stipulation that the information comes in, in the alternative."

The prosecutor opposed the application as "impermissible hearsay" but confirmed that the detective's DD-5 indicated that Roche heard numerous shots and observed a male Hispanic with a black gun in his right hand, "twenty plus," get into "a gold or gray Maxima or Altima type vehicle." The gunman wore a light blue shirt, dark brown baggy jeans with dark sneakers and short black hair (768-769). The car then backed down the street in front of his store. The other man, the driver, was also a male

Hispanic. "And he does volunteer that the license was New York State license plate," the prosecutor acknowledged (769-770). The prosecutor, however, claimed that the statement was not contradictory to the People's witnesses' because Maximas, Altimas, and Camrys, "all look fairly similar." "It's hardly the kind of exculpatory testimony that just blows up in a case," the prosecutor opined (770-771).

The court refused "to characterize the probative value" of Roche's testimony but noted that "[Roche] did not actually see the shooting or was able to identify the persons who did it." "And fortunately, there is a witness, seemingly unimpeachable, who does in fact, contradict to some extent [Roche's] testimony with regard to the car" (772). The court also felt that the Roche DD-5 was "unclear" about the car having New York plates because he said "that the vehicle had NY plates, but he does not remember seeing any license plates." "So I'm not sure what that means," the court said (772).[5] The court felt that the defense was asking it to do "pretty much the same thing that you asked me to do with regards to Mr. Vasquez and that is admit this evidence as a form of punishment to the People for not

---

[5] One obvious interpretation that reconciles Roche's clear statement that the plates were New York plates with the claim he did not "see the license" is that he did not see or remember the specific license plate number, but could recognize it was a New York plate.

disclosing this testimony to you at what you feel is the correct time," but that was not "the appropriate remedy" (772).

Defense counsel noted that a <u>Brady</u> violation required some sort of remedy and here, the defense was unable to explore or even refer to the exculpatory statements of Edwin Vasquez and Ariel Roche (788). The court's preclusion of any cross-examination regarding the police failure to fully investigate these statements, also meant that the issue was "not solely a <u>Brady</u> violation," counsel reiterated (787-788). The defense had asked for dismissal, and in the alternative requested that it be allowed to ask about the information in the police reports and "explore those issues in front of the jury, even though without the violations, there is some hearsay contained within them" (788). The court ruled that "the reasons I gave for [previously] denying those remedies would be the same reason that I would give to deny this remedy" (792). The People had complied with their <u>Brady</u> obligations in sufficient time in light of "the status of those witnesses, where they were, how reachable they were, whether they were even available in the first place" (793).

Summations

Defense counsel argued that the case was characterized by "poor, deceptive police work, no pictures, no fingerprints, no testing blood stains, [and] jumping to conclusions" (809).

21

Shell casings were found 40 feet away from where they were
supposedly ejected, and small, silver cars became gold Camrys.
The police never entered into the apartment into which Colon
fled. "That's the problem with this police investigation,"
counsel argued, "it was bad" (810). Although Marge Rodriguez
stated unequivocally that petitioner's car was not the gray or
silver, smaller car with a different sun roof she saw the
shooters use that day, the detective never followed up (816,
880-883). Detective Alfred's investigation "was to try to take a
square peg and fit into a round hole." "None of it matches and
he keeps going and going and going, like a horse with blinders
on, and never looks at what the other evidence is next." "He
doesn't go back [to interview Rodriguez] because it doesn't fit
what he wants. He doesn't look at anything except the things
that he wants to see and what he wants to see is the man who he
thinks committed this shooting get arrested, and he does that
completely eliminating and not even paying any attention to the
other evidence in this case" (826).

The prosecutor's summation claimed that the "defense spoke
a lot about Detective Alfred's investigation and about how he
chose the suspect and then did everything he could to make all
the evidence fit" but that argument was "just not consistent
with the evidence in this case" (906). "Detective Alfred
conducted a thorough investigation. He interviewed witnesses. He

22

did a lot of interrogatory stuff, and he told you that." The prosecutor claimed that any claimed lack of investigation was "speculation" since Alfred "followed up on leads." Although the defense, "begged you to speculate about some of that investigation," "you were instructed that you can't speculate about issues of the law and matters of the law that are not before you are things you can't speculate on, so I'm going to ask you to refrain from speculating about things that aren't before you." "Detective Alfred, I submit to you, did a good job on this case" and "he followed up on leads" (907). While Marge Rodriguez said the shooters' car was smaller than petitioner's, "from six stories up, everything looks smaller" and it was "just a difference in perspective." It was sunny on the day of the shooting and the light "could easily have been mistaken for silver or gray" on the gold car, the prosecutor argued (919).

<u>Verdict and Sentence</u>

The jury returned a verdict acquitting petitioner of both counts of second-degree murder but convicting him of first-degree manslaughter and both counts of first-degree assault (1028-1030). On March 18, 2004, the court sentenced petitioner to consecutive sentences of 25 years on the first-degree manslaughter conviction, and ten years on each of the first-

degree assault charges, for an aggregate sentence of 45 years in prison (S. 21).

The Appeal to the Appellate Division, First Department

On June 27, 2006, petitioner perfected his appeal in the New York Supreme Court, Appellate Division, First Department, raising a Brady claim due to the People's delayed disclosure of non-redacted Dd-5's. and a confrontation claim regarding limitations on cross-examination about the failure of the police to investigate the exculpatory information.

In a decision dated October 25, 2007, the Appellate Division affirmed petitioner's conviction. The court wrote that "defendant is not entitled to a new trial based on the People's delay in disclosing contact or pedigree information concerning two possible sources of allegedly exculpatory testimony" (Opinion at 1). The court characterized the information in the Edwin Vasquez DD-5 as a "cryptic conversation" where Vasquez reached the opinion that the person was "referring to the instant homicide" and "admitted being the perpetrator." Similarly, the Ariel Roche DD-5 was "a somewhat equivocal and self-contradictory description used in the shooting that varied slightly from that of the car described by the People's trial witnesses," the court wrote (Opinion at 1-2). The court found that the redacted reports "contained sufficient information to allow the defense to conduct an investigation of the relevant

24

allegations" and that there was no reason to believe that earlier disclosure of the redacted information would have resulted in either witness being available to testify for the defense (Opinion at 3).

The court also concluded that "defendant has not established that either witness, if called, would have provided material exculpatory testimony" since "there is no indication of the basis for [Vasquez's] apparent conclusion that the alternative suspect was referring to the incident at issue" and since "there was evidence that there were two participants in the crime," Julio Guerrero "could simply have been defendant's accomplice" (Opinion at 3). Similarly, "the exculpatory value of Ariel Roche's testimony was also "very limited," according to the court, because the "description in the police report was equivocal and not at significant variance from the People's evidence" (Opinion at 3-4). The Appellate Division also found each report was hearsay and not admissible under any recognized hearsay exception (Opinion at 4).

The Appellate Division also concluded that the trial court had properly refused to allow any questioning about the contents of the report and there was no violation of petitioner's rights to confrontation and a fair trial. "Although defendant claims he was not offering this information for its truth, but to show the inadequacy of the police investigation," the report contained

"multiple levels of hearsay, and depended, for its relevancy, on at least some level being true." Moreover, "the proposed line of inquiry was not critical to the defendant's defense," the court asserted (Opinion at 4-5); People v. Alvarez, 44 A.D.3d. 562 (1st Dept. 2007).

On November 7, 2007, petitioner submitted an application for leave to appeal to the New York Court of Appeals raising these issues and leave was denied by Chief Judge Kaye on January 11, 2008. People v. Alvarez, 9 N.Y.3d 230 (2008).

The Habeas Corpus Petition

On March 24, 2009, petitioner filed a habeas corpus petition raising the Brady and confrontation claims he had presented in state court. Judge Colleen McMahon referred the petition to Magistrate Judge Pitman who, on May 3, 2013, recommended that the petition be denied in all respects. On June 19, 2013, petitioner filed his objections to the Magistrate's report, arguing that the finding that the police DD-5's about this shooting incident were insufficiently connected to the incident, were not "exculpatory" and were "speculation" were erroneous. Petitioner also challenged the Magistrate's conclusion that there was no violation of petitioner's conformation rights arising from the court's steadfast refusal to allow the defense to cross-examine about the police failure to investigate this information.

The District Court Opinion

In her decision and order of July 12, 2013, Judge McMahon disagreed with the Magistrate Judge's conclusion that the "trial court committed no error by failing to allow Petitioner to pursue a line of questioning concerning the adequacy of the police investigation," and found that petitioner's Sixth Amendment right to confrontation and to present a defense was violated (RA.74).[6]

The trial court had denied defense counsel's application but had focused exclusively on the Brady aspect of counsel's application. The trial court had relied upon New York's "third party culpability" doctrine since there was no "clear link" between Julio "Chan" Guerrero and the murder in its view. It denied any cross-examination about the investigation or lack of investigation also because there was no "clear link" of third-party culpability and cited various "clear link" cases (RA.85). The District Court noted, however, that the New York Court of

---

[6]    The court "ultimately" concluded that the People did not commit a Brady violation, "although I strongly disagree with the Magistrate Judge about why that is so" (RA.74). While the District Court agreed with the Magistrate Court's determination that the Brady claim should be rejected (RA. 98-101), it disagreed with the Magistrate's claim that the evidence in the DD-5's was not Brady material, because it "did not exculpate" petitioner. It found instead that the delayed disclosure, the failure to provide unredacted copies, did not amount to true "suppression" since only the contact information was redacted and there was no reason to believe that earlier full disclosure would have allowed the defense to locate these witnesses (RA.101-103).

27

Appeals had rejected the "clear link" test and held that third party culpability was subject to the probative versus prejudice, possibility of delay, prejudice or confusion test as all other evidence (RA.86).

Defense counsel had urged the trial court to withhold its ruling until it heard the defense testimony of Margie Rodriguez – consistent with the Vasquez and Roche DD-5's - that the perpetrator's was grey or silver with a sunroof. The trial court stated that if there was "a greater link", "the kind of link that I think the cases call for" then "we will discuss it" (RA.87). The trial court failed to address counsel's argument that "he wanted to cross-examine the police about their failure to look into leads that pointed to someone other than petitioner, not for the fact that Guerrero was the shooter, but to suggest the police bias and to raise a reasonable doubt based on the manifest incompleteness of the investigation," the District Court wrote (RA.87).

With regard to this 6th Amendment Confrontation Clause claim, however, the court agreed that petitioner was denied the right to confront witnesses and present a meaningful defense, because the trial court refused to allow him to cross-examine about their failure to look into information that might have led them to a different shooter (RA.103). The District Court found that the Supreme Court in both Davis v. Alaska , 415 U.S. 308,

28

317-318 (1974), and Delaware v. Van Arsdall, 475 U.S. 673, 679-680 (1986), had struck down limitations on cross-examination that effectively prevented the defendant from highlighting the jury possible biases of government witnesses.

In addition, the District Court noted that the Supreme Court had also stressed the importance of allowing the defense to inquire about potentially exculpatory information not pursued by investigating police officers or prosecutors in Kyles v. Whitley, 514 U.S. 419 (1995). In Kyles, the failure of the police to disclose evidence linking an individual named "Beanie" to the crime undermined the defense's opportunity to raise a reasonable doubt by attacking the quality of the police investigation, since Kyles noted, "[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge defendant." Id. at 466 (RA.105). The evidence was material because the "defense could have examined the police to good effect on their knowledge of [the] statement[] and so have attacked the reliability of the investigation in failing to even consider Beanie's possible guilty. Id. (RA.106). Judge McMahon wrote:

> petitioner here was prevented from conducting meaningful cross-examination of the investigating detectives about their failure or refusal to follow up on the information given to them by Eddie Vasquez – information that arguably suggested someone other than petitioner was the perpetrator of

29

the crime. As was true in <u>Olden</u> [<u>v. Kentucky</u>, 488 U.S.227 (1988)], cross-examining the officers about something as elemental as their failure to dial the telephone number of the person identified as "Julio" (street name "Chan")[7] – let alone use a reverse directory to locate his address, bring him in and take a photograph that could be included in the "street name Chan" photo array, or shown to the surviving victims – had the "strong potential to demonstrate the falsity" of the State's case. It would have bolstered the defense argument that the police were negligent and their investigation was lax, as well as "sullied the credibility" of the investigating detectives – especially Detective Alfred, who testified at trial, and whose investigation the People touted as comprehensive in summation (RA.106).

The jury never learned that the detectives failed to follow up on a voluntary statement, obtained two days after the shooting, that included contact information for a man who allegedly made inculpatory statements about "the homicide that occurred in the 41 precinct" and who was able to give details about the shooting that only the perpetrator would have known (such as the type of gun used)(RA. 107). While the trial court had claimed that there was "no legitimate basis in the law" for the defense to question the detective about his failure to investigate this information, <u>Kyles</u> had made clear that the defense should be allowed to cast doubt on the police

---

[7] The District Court noted that Detective Alfred admitted, outside of the presence of the jury, that this was never done (RA.106).

30

investigation as a way of discrediting the testimony of the investigating police officers (RA.108).

In addition, no state rule of evidence, and, certainly not the "third party perpetrator" rule which the trial court relied on, can bar such questioning. Indeed, with regard to its the third-party perpetrator ruling it was "highly questionable in this case whether the state court evidentiary ruling was correct," since it repeatedly applied the "clear link" standard (RA.108-109). Yet, even when an evidentiary rule is technically correct, it cannot, under the Supreme Court's rulings, infringe upon a weighty interest of the accused, and the court must consider whether it was "arbitrary" or "disproportionate to the purposes [it is[ designed to serve". United States v. Scheffer, 523 U.S. 303, 308 (1998)(RA.108).

The error in disallowing cross-examination became "particularly egregious" in summation when the prosecutor exploited the "gigantic hole in the record" to trumpet the purported thoroughness of the investigation and argued any claim to the contrary was mere "speculation" – all the while knowing that the "failure to investigate a significant lead was demonstrable fact" (RA.109).

As for the Appellate Division's determination that cross-examination about the police investigation depended on its force on "at least some level [of hearsay] being true," the District

31

Court wrote that was "simply not correct." Everything Vasquez
said might have been wrong, but the "force of the cross-
examination derives from the fact that it shows the police
choosing to ignore an entire line of inquiry that *might* have
(not that *would* have) ended up exonerating petitioner" (RA.110).
Under federal confrontation requirements, such an argument can
be made to cast reasonable doubt on the People's claim that all
the evidence pointed to petitioner as the shooter (RA.110).

Finally, the error was not harmless beyond a reasonable
doubt, because such testimony about the police failure to
investigate was "absolutely essential" to the defense (despite
the Appellate Division asserting it was "not critical to
defendant's defense". The defense was "trying a reasonable doubt
case, in which the flaws in the police investigation played a
central role" (RA.110-111).

Nor was the People's case so strong that the confrontation
error was harmless (RA.112):

> The information Vasquez gave the police, on
> which they failed to follow up – about a man
> named Julio, who drove the exact type of car
> identified by an eyewitness as the car
> involved in the crime, who had issues with
> the deceased that might have given him
> motive for the shooting, and who made
> inculpatory statements that included
> information about the killing not known to
> the general public – went directly to the
> weaknesses in the People's case (and,
> parenthetically, bolstered one of the
> strengths in the defense case, Rodriguez's

testimony about the shooter's car). Had the jury known what the police chose to ignore, it could have given rise to reasonable doubt in the minds of the jurors - about the thoroughness of the investigation, about the competence and lack of bias about the police, and hence about petitioner's guilt (RA.112-113).

As a result, petitioner's right to cross-examine the police about shortcomings in their investigation violated petitioner's Sixth Amendment right to confrontation and his due process right to present a defense, and the District Court granted the writ (RA.113).

## ARGUMENT

### POINT I

THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE STATE COURT DEPRIVED PETITIONER OF HIS RIGHTS TO CONFRONTATION AND TO PRESENT A DEFENSE WHEN IT PRECLUDED ALL QUESTIONING REGARDING THE POLICE FAILURE TO INVESTIGATE INFORMATION THAT JULIO "CHAN" GUERRERO, WHO DROVE A GRAY CAR, SHOT DANIEL COLON WITH A 9 MILLIMETER PISTOL FOR REASONS UNRELATED TO PETITIONER'S OSTENSIBLE MOTIVE. U.S. CONST. AMENDS. VI; XIV.

The District Court correctly concluded that petitioner was denied his rights to present a defense and to confront and cross-examine the lead detective when the trial court refused to allow any questioning about the police failure to investigate the information in the Vasquez DD-5 indicating that a man later identified as Julio "Chan" Guerrero shot Daniel "Dap" Colon.

33

Guerrero drove a gray car and used a 9 millimeter pistol, and while that information gibed with information known to the detectives, they never attempted to phone Guerrero or his wife, or to show Guerrero's photo to any of the eyewitnesses. Although the defense had predicated its case on attacking the police investigation and the leads not followed, counsel was not allowed to expose the police failure to follow this lead to the jury. In fact, the jury never learned of any alternative suspect or theory of the case, permitting the prosecutor to misleadingly and quite dishonestly argue in summation, that the police had fully followed every lead. Any defense claim to the contrary was rank and prohibited speculation.

The state court conclusions that the DD-5 was not about this case, or was admitted for the truth of the information, rather than the police failure to attempt to discern the truth of the information, were errors, and, constituted unreasonable applications of Supreme Court precedent on the right to confront witnesses and to present a defense. The defense was improperly precluded from "exposing to the jury the facts from which the jurors could appropriately draw inferences relating to the reliability" of the lead detective and the police investigation. Delaware v. Van Arsdall, 475 U.S. at 680. As a result, this Court should affirm the District Court's opinion and order.

34

The AEDPA Standard

When a state court has decided a claim on the merits, the federal court must apply AEDPA's deferential standard of review. See Torres v. Berbary, 340 F.3d 63, 68 (2d Cir. 2003). Under AEDPA, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding." 28 U.S.C. §2254(d). In conducting this analysis, federal courts are to presume that the factual findings of state courts are correct. Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997), but the petitioner can rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"[A]n unreasonable application of clearly established Supreme Court precedent occurs when a state court correctly identifies the correct governing principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. 362,

413 (2000). The "objectively unreasonable" standard of §
2254(d)(1) means that petitioner must identify some increment of
incorrectness beyond error in order to obtain habeas relief."
Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003). A habeas
petitioner need not show that a state court has applied Supreme
Court law "in a manner that reasonable jurists would all agree
is unreasonable," in order to establish a right to relief under
this clause." Williams v. Taylor, 529 U.S. at 409, but whether
the state court decision applied high court precedent in an
"objectively unreasonable" manner. Lockyear v. Andrade, 538 U.S.
63, 73 (2003).

Although this Court has noted that this abstract
formulation is "virtually tautological," Francis v. Stone, 221
F.3d 100, 111 (2d Cir. 2000), federal courts have provided
guidance concerning its application, and the standard is not
"clear error" but whether a "state court decision reveals an
increment of wrongness *beyond error.*" Id. at 110. This increment
is a "substantially higher threshold than mere error, Schiro v.
Landigran, 127 S.Ct. 1933, 1939 (2007), but need not be "so far
off the mark as to suggest judicial incompetence." Francis v.
Stone, 221 F.3d at 111.

Petitioner's Right to Confrontation

"Cross-examination is the principal means by which the
believability of a witness and the truth of his testimony are

36

tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). The Confrontation Clause is violated when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to expose to the jury the fact from which jurors could appropriately draw inferences relating to the reliability of the witness." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). "It is a clearly established principle of Supreme Court jurisprudence that the Confrontation Clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against him." See Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); Brinson v. Walker, 547 F.3d 387, 392 (2d Cir. 2008). "The right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." Delaware v. Van Arsdall, 475 U.S. 673, 678-679 (1986). "The Court in Van Arsdall fashioned its rule in broad terms holding that a 'criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination to show a prototypical form of bias on the part of the witness.'" Brinson v. Walker, 547 F.3d at 393, quoting Delaware v. Van Arsdall, 475 U.S. at 680.

In Davis, the Supreme Court held that the constitutional right to cross-examine a witness includes the opportunity to

expose a witness's biases and possible motives to lie. The Court held that the defendant should have been allowed to cross-examine a prosecution witness about his relationship with law enforcement, which may have provided the witness with a motive to fabricate accusations against the defendant to obtain leniency. Id. at 316-318; cf. United States v. Maldonado-Rivera, 922 F.2d 934, 955 (2d Cir. 1990)("The court should avoid any blanket prohibition on exploration that is central to an assessment of the witness's reliability"). "[T]he question is whether the jury is in possession of facts sufficient to make a discriminating appraisal of the witness's credibility." Cotto v. Herbert, 331 F.3d 217, 249 (2d Cir. 2003).

Here, the prohibition of all questioning concerning the detective's failure to follow up on the Julio Guerrero lead prevented the jury from making a "discriminating appraisal" of the detective's credibility. See Davis, 415 U.S. at 318 (limitation on cross-examination rendered defendant "unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked the degree of impartiality expected of a witness at trial"). As the Court stressed in Van Arsdall, "a reasonable jury might have received a significantly different impression of the [witness's] credibility had [the defendant] been permitted to pursue his proposed line of cross-examination." 475 U.S. at 680.

The Constitution ensures a defendant's right to use cross-examination to present a defense. See Davis 415 U.S. at 317. Whatever a trial court's general discretion might be to limit cross-examination, it does not permit the court to restrict a defendant's right to present a defense. See Chambers v. Mississippi, 410 U.S. 284, 294-295 (1965). In its line of cases addressing restrictions on the scope of cross-examination, the Supreme Court has insisted that such restrictions should be narrowly focused and anchored about concerns about "harassment, prejudice, confusion of the issues, the witnesses' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. at 679. The Court has struck down restrictions that sweep more broadly and "effectively emasculate the right of cross-examination itself," Delaware v. Fensterer, 474 U.S. 15, 19 (1985).

In Olden v. Kentucky, 488 U.S. 227, 232 (1988), the Supreme Court found that the defendant's Sixth Amendment right to confrontation was violated when the trial court barred a defendant in a rape case from cross-examining the complainant about her extramarital affair with another man. 488 U.S. at 229-230. Such evidence was relevant to the defendant's claim that he and complainant had engaged in consensual sexual acts and that the complainant, out of fear of jeopardizing her relationship with boyfriend, had lied when she told boyfriend she had been

raped. Id. at 232. Similarly, in Van Arsdall and Davis, the
Court struck down limitations on cross-examination that
effectively prevented the defendants from highlighting to the
jury possible biases of key government witnesses. Van Arsdall,
475 U.S. at 679-680; Davis, 415 U.S. at 317-318.

The District Court looked to the Supreme Court's decision
in Kyles v. Whitley, 514 U.S. 419 (1995) as illustrative of the
principles enunciated in Van Arsdall and Davis since a common
defense trial tactic is to attack the thoroughness and
credibility of the police investigation, and the possible biases
of government witnesses involved in the investigation. Judge
McMahon noted that "like the defendant in Kyles, petitioner here
was prevented from conducting meaningful cross-examination of
the investigating detectives about their failure or refusal to
follow up on the information given to them by Eddie Vasquez –
information that arguably suggested someone other than
petitioner was the perpetrator of the crime." Similarly, as in
Olden, cross-examining the officers "about something as
elemental as their failure to dial the telephone number" of
Julio Guerrero -- let alone using a reverse directory to locate
him, bring him in and photograph him and put his photo in array
for the witnesses -- had the "strong potential to demonstrate
the falsity" of the State's case. As in Kyles, it would have
bolstered the defense argument that the police were negligent

and their investigation was lax, as well as "sullied the credibility" of the investigating detectives – especially Detective Alfred, who testified at trial, and whose investigation the People touted as comprehensive in summation. Those restrictions improperly precluded the defense from "exposing to the jury the facts from which the jurors could appropriately draw inferences relating to the reliability" of the lead detective and the police investigation. <u>Delaware v. Van Arsdall</u>, 475 U.S. at 680.

Petitioner's defense was built around exposing the weaknesses in the People's case. The Appellate Division's conclusion that the proposed cross-examination on the failure of the police to investigate was "not critical" to the defense was plainly and unreasonably incorrect. Rather, as the District Court properly concluded, it was absolutely critical to the defense case, and was the primary argument for raising a reasonable doubt. Counsel opened by arguing that the case was the result of "poor, deceptive police work" and "jumping to conclusions," and that the quality of the police investigation was "going to be a major issue in this case," because the police "did a less than adequate job." "You are going to hear evidence that [the police] failed to follow leads, they failed to interview witnesses that didn't match their theory that Mr. Alvarez committed this crime," and "they failed to follow leads

41

that someone else may have committed the crime." The jury would determine whether the police had "important information that they didn't follow up on" and "completely tossed aside, evidence indicating that someone else may have committed this crime." However, as a consequence of the court's preclusion rulings the jury never heard the evidence concerning a failure to follow leads that someone my have committed the crime. While the defense made this same argument in closing, it was deprived of any real substance since the court had refused any cross-examination on it. See Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006)(Court looks to whether line of inquiry would have "create[ed] a reasonable doubt that did not otherwise exist" had it been admitted").

In summation, defense counsel argued that the case was characterized by "poor, deceptive police work, no pictures, no fingerprints, no testing blood stains, [and] jumping to conclusions." "That's the problem with this police investigation," counsel argued, "it was bad." "None of it matches and he keeps going and going and going, like a horse with blinders on, and never looks at what the other evidence is next." The detective "doesn't go back [to interview Rodriguez] because it doesn't fit what he wants. He doesn't look at anything except the things that he wants to see and what he wants to see is the man who he thinks committed this shooting

get arrested, and he does that completely eliminating and not even paying any attention to the other evidence in this case."

While counsel was able to generally claim that the investigation was slipshod and conclusion-driven, the jury never learned how truly shoddy the investigation was since counsel could not cross-examine the detectives about their failure to investigate these leads and an alternative theory of the case. The jury never learned that Julio Guerrero had confessed to this crime and the detectives never bothered to use the telephone number provided by Vasquez, locate Guerrero and question him about his confession. They never bothered to learn that his wife was named Bianchi and they never bothered to show Guerrero's photo to any of the eyewitnesses. Exposing these facts regarding the lack of investigation to the jury would have been a tremendous tool in the defense effort to raise a reasonable doubt.

### The Vasquez DD-5 Was Indisputably About This Case

The District Court correctly found that the State courts' finding that the Vasquez DD-5 might not have been about the shooting in this case was unreasonable. See 28 U.S.C. §2254 (e)(1). This argument was first made by a trial prosecutor in response to the defense Brady claim. That self-serving claim by the prosecutor, however, was contrary to the investigating detectives' view, since that information was generated for this

case and placed in the case file for this case. Edwin Vasquez came forward to talk to the detectives investigating this incident, the shooting death of Daniel "Dap" Colon. There was certainly no claim by the detectives that there was another shooting that day on Bryant Avenue or that they were somehow unclear about what incident Vasquez was talking about.

While being questioned outside of the jury's presence, Detective Alfred never asserted that he failed to investigate this information because he did not believe it was about this shooting. The detectives also never claimed there was anything ambiguous about the report and the admission that Guerrero "took care of the problem" while talking about the shooting death of Dap Colon.

According to Detective Alfred, "A couple of detectives from my office went over to interview [Edwin Vasquez] and he informed them that he had information regarding the shooting and the homicide up on Bryant Avenue." Julio "Chan" Guerrero had said that the person killed had insulted his wife, Vianchi or Bianchi, and then had punched Guerrero when Guerrero confronted him. Guerrero vowed not to let it lie, and, with reference to the deceased person on Bryant Avenue, "took care of" the "problem" he had with a 9 mm. pistol. Certainly, if petitioner had come forward, and rather than maintain his innocence, had told the same story of "taking care" of the problem on Bryant

44

Avenue with a 9 mm. after an insult to him and his wife, there would not be any question in anyone's mind, let alone the trial prosecutor's, that he was referring to this incident.[8]

Detective Alfred testified on the People's direct case -- without contradiction by the trial assistant at that time:

> In connection with the [Dap Colon] investigation there was a phone call placed to my office [and] a detective stated that he had an individual who had information regarding this case. A couple of detectives from my office went over to interview this individual and he informed them that he had information regarding the shooting and the homicide up on Bryant Avenue. He informed them that he knew this one individual named Julio that went under different street names as Chang or Chung. So the detective, Detective Monaco[9], who is presently retired, he went back to the office prepared a photo array of those individuals in which the computer spit the names out under Chang or Chung (345)(emphasis added).

Thus, it was certainly the view of the lead investigator of this case that Vasquez was talking about the "Dap" Colon

---

[8]    Indeed, the People seemed to accept this fact in their Appellate Division brief. They wrote that Julio Guerrero confronted "the deceased" and the "the deceased" punched Julio in the face and later said "he can't let that lie." See People's Appellate Division brief at 20, n. 8.

[9]    The defense asked to interview Detective Monaco during the trial to clarify and ambiguities in the testimony, but the People refused, and the court did not make him available. Thus, while the People now write that the information was "recorded by a non-testifying detective" (People's brief at 33), that was because they refused to call him as a witness or to make him available to the defense.

homicide on Bryant Avenue, not some other unnamed homicide.[10] The report was placed in the detectives' case file for this case. Yet, for reasons that were never explained, and went to the heart of the defense case about the poor investigation of alternative leads in this case, the detectives never followed up. They did not bother to call the telephone number which Vasquez had given him or use that number to ascertain that Guerrero lived very close to the shooting scene and had a wife named Bianchi, just as Vasquez had stated, and drove a four-door, "charcoal Acura," consistent with some of the eyewitness descriptions in this case. Guerrero also had a criminal record involving narcotics. Instead, they simply ran a Nitro computer check using the street names "Chan" or "Chung" and found two photos of individuals.

Vasquez told them neither photo was of Julio Guerrero, but the police showed the photos of these individuals to Manny Colon and Aramis Fournier anyway, who, not surprisingly, did not recognize them. They never spoke with Guerrero and they never showed Colon and Fournier, or other witnesses like Margie

---

[10]   The District Court appeared to be taken aback by this argument when it wrote, "[t]he People actually argued that Julio-known-as-Chan could have been talking about a different "recent shooting on Bryant Avenue" – even though Vasquez had given information about the "recent shooting on Bryant Avenue" two days after the Colon/Colon/Fournier shooting, to the detective who was investigating that shooting and not some other shooting (RA.84).

Rodriguez and Ariel Roche, a photo of Guerrero. The prosecutors assigned to this case then turned over the DD-5 report to defense counsel. Thus, as the District Court correctly found, the Vasquez DD-5 was clearly about this case, and the inexplicable failure of the police to investigate this exculpatory information was relevant and important.

### The Trial Court's "Clear Link" Rationale for Denying Cross-Examination Was Wrong Under New York Law

By the same token, the state court's claim that the Vasquez statement was not sufficiently "linked" -- or did not meet the third-party culpability balancing test of probativeness versus prejudice -- was plainly unreasonable. The trial court precluded cross-examination about the DD-5 and the police failure to investigate the leads in it, because it claimed that "there must be a clear link that established that it was another that committed the crime," a "clear link" "to a third-party perpetrator." According to the court, the evidence regarding "third-party culpability" was "speculation" and did not meet the "clear link standard." The court therefore precluded any cross-examination "about the nature of this investigation in large measure because that evidence does not or that investigation does not establish, in my judgment, the clear link that these cases call for when introducing evidence of third-party culpability."

In fact, until 2001 New York courts had excluded evidence of third-party culpability absent "a 'clear link' between the third party and the incident." See People v. Primo, 96 N.Y. 2d 351, 355 (2001). In Primo, however, the New York Court of Appeals held that the admissibility of third-party culpability was subject to "conventional" evidentiary principles that relevant evidence is admissible when its probative value outweighs its prejudice. 96 N.Y. 2d at 355-56. To the extent that the trial court employed the "clear link" test, that clearly was error since it was no longer the law of New York. Similarly, although the People now mischaracterize the District Court's view of the law as one where a trial court "must permit all information relating to the quality of the investigation no matter how chimerical that information may be, despite well-established rules of evidence," the record shows that the trial court failed to follow New York law and the rules of evidence when it required a "clear link." There also was nothing "chimerical" about the information since, as noted ante, it was clearly about this case.

Somewhat bizarrely, the trial judge looked at all of the evidence in the Guerrero confession inculpating Guerrero and exonerating petitioner, and since it did not match the prosecution's theory of the case, concluded that it must not be about this case. That hardly constitutes a reasonable form of

"balancing." The court ruled that since the description of Julio
Guerrero in the DD-5 did not match petitioner's description and
Guerrero's gray Acura did not match "any automobile that I know
of that's involved in this case" the DD-5 was not a "clear link"
to another perpetrator. Also, the court claimed that was "no
evidence whatsoever" that there was an argument between Guerrero
and Danny Colon, "rather than Julio's wife," Bianchi, the court
said. "[T]here is no other evidence that's been developed so far
which would support this theory, certainly not the photo
arrays," the court declared, even while those arrays did not
contain Guerrero's photo. The trial court said that because "the
description that I read in the DD-5 does not, in my judgment
match the Defendant," it was not linked to this case. However,
that was precisely the point since the police investigators had
failed to follow up on leads suggesting that it was not
petitioner but Julio Guerrero who shot the deceased.

 The court continued in a similar Kafkaesque vein: "There is
an automobile that's described that does not match any
automobile that's involved in this case." As the District court
noted, Margie Rodriguez, and to some extent, Ariel Roche, had
offered evidence that there was such a gray car "involved in
this case." Guerrero's gray Acura was a key component of the
defense view that the police failed to pursue a lead pointing to
a different man in a different car with a different motive

committing this crime. The trial court further found that "there's no evidence whatsoever in this case that there was some sort of argument between that Julio [and] the deceased." But again, that simply pointed to a different shooter for a different motive, not that Vasquez and Guerrero were not talking about this Bryant Avenue incident.[11]

Such "reasoning" also is effectively circular since the reason why there was "no evidence whatsoever" was because the detectives did almost nothing to follow up on this information. Ironically, that "reasoning" was offered to reject counsel's protest that he wished to cross-examine about the lack of police investigation in this case about that information. Additionally, the court was aware that counsel had discovered that Julio

---

[11] According to the Appellate Division and the Magistrate Judge's ruling, the DD-5 was not exculpatory because petitioner, Julio Alvarez, had unnamed and unexplained problems with Dap Colon, and Julio "Chan" Guerrero also had a very specific problem with Colon due to the insult to himself and his wife. Under this theory, the shooting was carried out by two men each named Julio, who each had a problem with Dap Colon for separate reasons and joined forces to attack Colon, even without any claim that petitioner and Guerrero knew one another. The Vasquez DD-5 also contained information that Guerrero usually associated with a man named "General" but there was no claim by the police or prosecution that petitioner was ever known as "General." While the courts focused on the presence of two shooters it simply ignored the information as to a separate motive and a different car than petitioner's (or that a gray car was seen by one eyewitness, and the other thought the car could have been gray). Thus, the courts were able to conclude that the DD-5 was not exculpatory by simply ignoring all the exculpatory information within the DD-5. The District Court correctly found that determination unreasonable.

Guerrero had a wife named Bianchi, just as Vasquez stated, a record of narcotics selling, and lived in the neighborhood. He also stated that a 9 millimeter was used, just as in this incident. The court ignored all of that corroborating evidence. As the District Court found, this ruling unreasonably applied Supreme Court precedent.

## The State Court Was Incorrect in Forbidding Cross-Examination Because the Information Was Not Offered for Its Truth

Similarly, the state courts were incorrect in excluding the questioning about the failure to investigate the Julio Guerrero lead because that information in the DD-5 was not offered for its truth. On appeal, the People now characterize the detective's failure to investigate this information as "a purported failure to follow-up" on the "allegedly exculpatory" information (Appellant's Brief at 34), but in fact, the detective undeniably, and inexplicably, failed to follow up on the information. He admittedly did not even telephone the number provided by Vasquez, let alone speak to Julio Guerrero or his wife Bianchi, and, critically, also never bothered to obtain a photo of Guerrero to show to either the two prosecution eyewitnesses or the defense witness, Margie Rodriguez. The police failure to investigate, undercutting their credibility and the credibility of their investigation, was also

51

"exculpatory" even if the information was not admitted for its truth.

The Appellate Division's finding that the information had to be true on at least some level to be "relevant" was "simply not correct," as the District Court properly concluded. Everything Vasquez said ultimately might have been wrong, but the "force of the cross-examination derives from the fact that it shows the police choosing to ignore an entire line of inquiry that *might* have (not that *would* have) ended up exonerating petitioner." Indeed, defense counsel had argued before the trial court that questioning about the failure of the police to pursue this other suspect was not hearsay, because it was "not coming in for the truth that the other Julio made the confession to Eddie Vasquez that he killed Dan Colon," but "to show the police had the information and they didn't act on it, and they did nothing." The police "did nothing to find the person [Vasquez] was talking about," and "the jury should know that there was another very viable suspect in this case, and they did nothing to follow-up and try to find this individual."

Counsel requested that he be able to elicit "the entirety of the information given to the police and the complete and utter lack of, inexcusable lack of preparation and investigation." That was not hearsay and it was essentially admitted, out of the jury's presence, by the lead detective.

The police failure to investigate this seemingly critical piece of information was a failure that cast their investigation, and the credibility of the lead detective, in a different light. Such questioning was vital to the defense and central to an assessment of the detective's reliability.

## The Failure to Expose the Detective's Investigation Allowed the Prosecutor to Misleadingly Exploit that Ruling

Indeed, precluding this cross-examination actually did mislead the jury. Here, out of the jury's presence, the detective admitted that he did nothing to really follow up on this information. Yet, by precluding the defense from eliciting this information, the court created an evidentiary vacuum, allowing the prosecutor to, in essence, lie to the jury by telling them that the detective had followed up on every lead. The prosecutor also misled the jury by asserting the defense claim to the contrary was simply "speculation," when she knew that was not true. With the police shielded from any questioning about the lackluster investigation, the prosecutor could assert in front of the jury that the "defense spoke a lot about Detective Alfred's investigation and about how he chose the suspect and then did everything he could to make all the evidence fit," but that argument was "just not consistent with the evidence in this case." "Detective Alfred conducted a thorough investigation. He interviewed witnesses. He did a lot

53

of interrogatory stuff, and he told you that." Any claimed lack of investigation was "speculation" since Alfred "followed up on leads." Although the defense "begged you to speculate about some of that investigation," "you were instructed that you can't speculate about issues of the law and matters of the law that are not before you are things you can't speculate on, so I'm going to ask you to refrain from speculating about things that aren't before you." "Detective Alfred, I submit to you, did a good job on this case" and "he followed up on leads." While the trial court had prohibited the defense from questioning about the police failure to pursue the exculpatory material in the Vasquez memo due to the specious claim that would result in jury "confusion," the prosecutor's summation sowed confusion and amounted to outright deception.

Watson v. Greene, 640 F.3d 501 (2d Cir. 2011), on which the People rely, presents an entirely different situation. There, the defense claimed that it had been denied its right of confrontation because the court had disallowed cross-examination about a note in the police file indicating that the accomplice, rather than Watson, had fired the fatal shot. The source of the information was a police officer who said it was "like vague information" indicating she "heard [the accomplice] was involved." The officer's sister "overheard a number of conversations" from the accomplice's family, possibly the

54

accomplice's mother, that indicated the accomplice "did this, that he didn't do it, to him having the gun and didn't have the gun." Id. at 504. The accomplice's mother was later contacted and denied ever saying that her son had the gun.[12]

Critically, in Watson, as opposed to petitioner's case, the defense was able to elicit a number of statements supporting the defense theory that the detective had prematurely determined that the defendant, rather than his accomplice, had been the shooter. Id. at 505. The defense cross-examination had elicited that the detective in Watson did not adequately investigate the fact the accomplice was the shooter. The defense elicited testimony that by the time the detective questioned the accomplice he knew that Watson already had been indicted for first-degree murder, that during the day and a half the detective spent with the accomplice he never asked him whether or not he had shot the deceased, and he never informed the accomplice that the defendant had accused him of having the gun. Id. As a result, this Court could not conclude that the trial court "so clearly abused its discretion that the appellate court's failure to find an abuse of discretion was an

---

[12]    Although the court had allowed "other examination on the thoroughness of the investigation," the defense sought to examine the detective on a document that indicated that the police officer "who was not involved in the investigation of this case" had "heard a rumor from her sister, who claimed to have heard it from [the accomplice's] mother, that it was [the accomplice] who had the gun" Id. at 511.

unreasonable application" of the Confrontation Clause. Id. at 512. Thus, because questioning was allowed on the investigators' failure to pursue the theory that the accomplice was the shooter, and the jury was aware that this lead was not thoroughly investigated, the Confrontation Clause was not violated. Watson "had ample ammunition to argue in summation, as he did, that the police had jumped to quickly to the conclusion that Watson was the killer, and passed up the opportunity to test that theory by pressing [the accomplice] (the only other candidate for the role as shooter) as vigorously as they had interrogated Watson" Id.[13]

In petitioner's case, in contrast, the jury never learned anything about Julio Guerrero, and the alternate theory, never pursued, that he had killed Dap Colon with a 9 millimeter pistol, drove a gray Acura, and shot Colon because of an insult to his wife, and Colon then slapping him when confronted.

The Improper Restrictions on Cross-Examination and the Right to Present a Defense Had a "Substantial and Injurious" Effect on the Jury's Verdict

In assessing the impact of these Confrontation Clause violations, a court looks to whether the error had a

---

[13] This Court also wrote, in a footnote, that Kyles v. Whitley, "provides no guidance about what evidence must be admitted at trial or what lines of questioning must be permitted to ensure a meaningful opportunity to cross-examine," and that the defendant "was accorded the opportunity to, and did, challenge the thoroughness of the police investigation." Id. at 512, n.11

"substantial and injurious effect or influence in determining
the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637
(1993). The Supreme Court has identified five factors courts
should consider in assessing the harmful effect of erroneous
limitation on cross-examination: "[1] the importance of the
witness' testimony in the prosecution's case, [2] whether the
testimony was cumulative, [3] the presence or absence of
evidence corroborating or contradicting the testimony of the
witness on material points, [4] the extent of cross-examination
otherwise permitted, and [5] the overall strength of the
prosecution's case." Delaware v. Van Arsdall, 475 U.S. at 684.
There is "a substantial burden of persuasion on the State" to
prove harmlessness" and a federal court's "grave doubt"
regarding harmlessness should be resolved in favor of the habeas
petitioner. Fry v. Pilier, 551 U.S. 112, 122 (2007). These
factors all strongly favor petitioner.

Detective Alfred, was the lead detective and investigator
in the case, so his role was of critical importance to the
prosecution. It was also critically important, perhaps more
important, to the defense, which had committed to a strategy of
attacking the quality of the investigation in its opening
statement. As noted, ante, Detective Alfred's role was touted by
the prosecutor in summation when she stressed that he had done a
completely thorough investigation. Concomitantly, the defense

57

was denied a chance to substantiate its claim that critical leads remained uninvestigated, and the prosecutor, dishonestly, could argue that they all were and any notion to the contrary was impermissible speculation.

Similarly, the testimony was not cumulative, as defense counsel pointed out in arguing for the right to cross-examine. The theory of an alternative suspect not properly investigated was simply not put before the jury. That is why the prosecutor was able to argue with impunity that all the evidence before the jury showed a complete and thorough investigation of every lead. And, with regard to the third factor, there was other evidence corroborating the information in the Vasquez DD-5, known to the detective, such as the witness saying the car was gray and with a different sun roof, and that the shooting was done with a 9 millimeter. Other evidence, easily obtainable through the most cursory investigation, would have shown that Guerrero lived nearby, drove a gray car, had a record of drug offenses, a wife named Bianchi, and had disappeared not long after the shooting. The detective was also aware of the contradicting evidence such as his witnesses' evolving and equivocal identifications and explanations, and the presence of a gray car mentioned by Margie Rodriguez and by Ariel Roche, as well as the different license plates.

The fourth factor, "looks at whether the effect of the defendant's deprivation of the particular cross-examination was diminished by other cross-examination that the defendant was allowed." Brinson v. Walker, 547 F.3d at 396. Again, in contrast to Watson, supra, and in close similarity to Brinson, the defense was not allowed other questioning that effectively put this information before the jury and therefore diminished the impact of the error. See Corby v. Artus, 699 F.3d 159, 168 (2d Cir. 2012)(no error where facts that defendant wished to elicit in precluded cross-examination "were effectively before the jury at his trial"). The jury never learned that Detective Alfred was alerted to the presence of another suspect but did not take the most basic investigative steps to follow up. To the contrary, the jury misleadingly heard that a Nitro check of computer generated suspects with the name "Chan" or "Chung" was done but Fournier and Colon did not identify anyone. That made it seem as if that theory was fully pursued, when in fact, as Vasquez pointed out, none of the photos were of the man he was referring to, and a photo of Julio "Chan" Guerrero could have been easily obtained and shown to those witnesses but never was.

As the District Court found, establishing this failure to investigate was "absolutely essential" to the defense:

> This was an eyewitness case. There was no forensic evidence tying petitioner to the crime - no ballistics, no DNA, no

59

> fingerprints. Aside from Marge Rodriguez –
> who could testify only about the shooter's
> car – there were no eyewitnesses who could
> counter the testimony of Fournier and Colon.
> The defendant was, therefore, trying a
> reasonable doubt case, in which the flaws in
> the police investigation played a central
> role. The testimony about the police failure
> to follow up on Vasquez's lead except in the
> must desultory way (putting together a photo
> array of people who went by the street name
> "Chan" or something similar – one that did
> not include Julio Guerrero) was not
> cumulative; there was literally no other
> evidence on the point (RA.111).

Finally, the reviewing court looks to the strength of the prosecution's case, "probably the single most critical factor." See United States v. Reifler, 446 F.3d 65, 87 (2d Cir. 2006). Although there were two eyewitnesses, as the District Court correctly concluded, their testimony was "far from unassailable." Both Fournier and Colon were drug dealers and neither of them identified petitioner on the day of the shooting. When asked, "Do you know who shot you?," Colon replied, "I don't know," although he later claimed to have seen petitioner around the neighborhood (285, 290-292). One of them gave a description at the hospital but it was a generic description of a Hispanic man. There was no mention of tattoos on the neck or forearm, and while petitioner was Hispanic, so was Guerrero.

When shown petitioner's photo six days after the shooting, Fournier said, "I'm not sure," even as he also claimed, "I never

60

forget a face." Fournier testified that he looked the shooter directly in the face while being shot, a contention that the District Court characterized as "a difficult assertion to credit," since it was entirely at odds with common sense and normal human behavior. Their explanations for their initial failures to identify were inconsistent. Colon simply claimed he "didn't want to tell the police" while Fournier insisted he, "didn't know I wanted him to get caught or not." Fournier claimed both that he preferred to get the shooter on his own, but also that he was "confused" as to how he might do that since he "didn't know who the shooter was."

Although Fournier and Colon initially claimed the shooter's car was "gold or gray," over time they only characterized the car as gold, consistent with the prosecution's theory of the case, although Margie Rodriguez was certain the shooter's car was gray, like Guerrero's. While Fournier claimed the shooter stood over Colon "finishing him off," that claim was flatly contradicted by the shell casings, none of which were near that area, by Margie Rodriguez, and by the medical examiner's testimony. Although the People speculate that all of these casings could have been kicked some distance away that seems wildly improbable. As the District Court concluded,

> The information Vasquez gave the police, on
> which they failed to follow up – about a man
> named Julio, who drove the exact type of car

61

> identified by an eyewitness as the car
> involved in the crime, who had issues with
> the deceased that might have given him a
> motive for the shooting, and who made
> inculpatory statements that included
> information not known to the general public
> - went directly to the weaknesses in the
> People's case (and, parenthetically,
> bolstered one of the strengths in the
> defense case, Rodriguez's testimony about
> the shooter's car). Had the jury known what
> the police chose to ignore, it could have
> given rise to reasonable doubt in the minds
> of the jurors - about the thoroughness of
> the investigation, about the competence and
> lack of bias of the police, and hence about
> petitioner's guilt (RA. 112-113).

There was no physical evidence linking petitioner to this shooting. While the People note that he had ammunition in the trunk of his car, and now claim that the ammunition linked him to the shooting, that current claim is at odds with their expert witness at trial. Their ballistics expert, Detective Barry, examined the rounds recovered from appellant's car but could not find any link to the shooting (593-594). The 45 rounds were from various manufacturers. While two of the spent casings from the shooting scene had the same manufacturer as one of the types of rounds taken from the car, the other six were from different manufacturers (595-596).

Thus, all of the factors, including the far from overwhelming proof in the prosecution's case, show that the error had "substantial and injurious" effect on the jury's verdict. For these reasons, the defense was improperly precluded

from "exposing to the jury the facts from which the jurors could appropriately draw inferences relating to the reliability" of the lead detective and the police investigation. <u>Delaware v. Van Arsdall</u>, 475 U.S. at 680. The District Court therefore properly found that the state courts' refusal to allow cross examination regarding the police failure to investigate the information in the Vasquez DD-5 was an unreasonable application of the Supreme Court's 6th Amendment decisions, and this court should affirm its decision granting the writ.

<u>CONCLUSION</u>

**THE JUDGMENT OF THE DISTRICT COURT SHOULD BE AFFIRMED, AND THIS COURT SHOULD REMIT THE ACTION TO THE DISTRICT COURT WITH INSTRUCTIONS TO FREE PETITIONER UNLESS THE STATE RETRIES PETITIONER WITHIN A REASONABLE TIME.**

Respectfully submitted,

WILLIAM CARNEY (WC-1067)
Attorney for Petitioner-
Appellee
The Legal Aid Society
Criminal Appeals Bureau
199 Water Street, 5th Floor
New York, New York 10038
(212) 577-3447
wcarney@legal-aid.org

January 23, 2014

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type-Style Requirements

1.   This brief complies with the type-volume limitation of
Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,810
words, excluding the parts of the brief exempted by Fed. R. App.
P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of
Fed. R. App. P. 32(a)(5) and the type style requirements of Fed.
R. App. P. 32(a)(6) because this brief has been prepared (except
for the cover) in a monospaced typeface using Word 2003 with 10
characters per inch in the Courier type style.

WILLIAM B. CARNEY(WC-1067)
Attorney for Petitioner-Appellee
Julio Alvarez